## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

**WENDY CHICKAWAY, INDIVIDUALLY,**                                **PLAINTIFF**
**AND AS ADMINISTRATOR and PERSONAL**
**REPRESENTATIVE OF THE ESTATE OF**
**BRANDON PHILLIPS, A MINOR, AND ON**
**BEHALF OF ALL WRONGFUL DEATH**
**BENEFICIARIES OF BRANDON PHILLIPS,**
**DECEASED**

**v.**                                **Civil Action No. 4:11-CV-22 CWR LRA**

**UNITED STATES OF AMERICA**                                **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

From August 13 through 16, 2012, this Court held a bench trial on Plaintiff Wendy Chickaway's claims of medical negligence and wrongful death against the United States of America arising under the Federal Tort Claims Act ("FTCA"). Plaintiff has brought this suit as the personal representative of her son, Brandon Phillips, and on behalf of his wrongful death beneficiaries. Brandon, a twelve year-old little boy, died of sepsis on June 12, 2007. Having considered the evidence at trial, oral argument, submissions of the parties, and the applicable law, the Court now issues its findings of fact and conclusions of law. The Court finds that judgment should be entered in favor of the Plaintiff.

### I. Findings of Fact

#### A. *Events of April 5, 2007*

On Thursday, April 5, 2007, Brandon was in class at Neshoba Central Middle School. He had his head down on his desk and complained that he did not feel well. The teacher sent him to the school nurse, who took his temperature; it registered at 98.2 °F. The nurse asked him

what signs or symptoms of illness did he have, and he could only articulate that he did not feel well.  Recognizing that he was ill, the nurse called his mother, Wendy Chickaway, to come and pick him up.  Chickaway testified that she gave him "some Tylenol" that was in their truck and Brandon rested.  Later that day, she took Brandon to the Choctaw Health Center ("CHC") in Choctaw, Mississippi, where he was seen by Nurse Practitioner Michelle Atkinson.  According to medical records, Brandon's chief complaint was "[Left] groin pain since Tuesday."  Ex. P-1, at 95.

He characterized the pain as a 3 on a scale of 1-10.  The medical records note that he had tenderness to palpitation of his left thigh, muscle tenseness, but no bruising.  His blood pressure was 135/68, which is within the normal range.  Brandon was diagnosed with a muscle strain.  He was given a Toradol injection (for pain relief) and was told to take an anti-inflammatory medication, specifically Motrin, rest for two to three days, and apply ice to the area.  He was then discharged.

The next day, Brandon stayed home from school resting in bed.  His mother and sister helped him with his activities of daily living.  He was able to walk to the bathroom by himself with a slight limp, but he did not walk around for most of the day.  Chickaway had the prescription for Motrin filled.  Brandon, however, had a difficult time swallowing the pills.  Chickaway then decided to give him a liquid form of Tylenol.  She called CHC to confirm the amount that she should give him and she followed their instructions.  Because the family had a funeral to attend the next morning, Brandon was taken to his father's house that Friday night.  Sadly, it would not be the last funeral the family would have to attend.

*B.  Events of April 7, 2007*

While Chickaway was at the funeral, on Saturday, April 7, 2007, she was notified that

-2-

Brandon's condition had worsened and that his father, Edward Phillips, had taken him to the emergency room at CHC.  Brandon and his father arrived at CHC at 12:40 p.m.  He was triaged at 12:45 p.m., placed in an evaluation room at 1:16 p.m. and was seen at 1:40 p.m.  Brandon's chief complaint was pain to his left hip for the last four days.  According to medical records, it was indicated that he had been injured playing basketball on Tuesday.[1]  The records also indicated that he had been evaluated in the emergency room on Thursday and had been prescribed Motrin.

Nurse Angela McDonald treated Brandon that day.  McDonald is a certified family nurse practitioner and has worked at CHC since 2001.  She has served at a variety of levels of the nursing profession, including as a nurse's aide, a licensed practical nurse, and a registered nurse.  McDonald performed an initial physical examination.  Her notes show that Brandon reported that his pain level was 10 out of 10.   She then requested X-rays to ensure that there were no broken or fractured bones.  She did not identify any problems in the X-ray results.  Next, McDonald requested laboratory testing.  Medical records indicate that Brandon's white blood cell count was 6.1, within the normal range of 4.5-13.5.  His sedimentation ("SED" or "sed") rate[2] was elevated

---

[1] The cause of Brandon's injury was unclear from the record and the source of some disagreement.  Chickaway testified that she recalled Brandon telling the staff at the Choctaw Health Center that he had fallen while playing basketball at his father's house, but also believed that he may have been injured during a physical education class at school.  The medical records from Brandon's visit on Thursday, April 5, 2007, reflect that he "denie[d] injury," but the records from his visit on Saturday, April 7th, reflect that the chief complaint was an injury from playing basketball on Tuesday.  Ex. P-1, at 89.  Nevertheless, all of the parties accept that there was an alleged injury.

[2] Erythrocyte sedimentation ("SED" or "sed") rate can be obtained through a blood sample.  The test assesses for inflammatory and necrotic conditions.  *Stedman's Medical Dictionary*, App'x at 139 (28th ed., 2006).  One of plaintiff's experts, Dr. Stephen Shore, explained in his report that the SED rate is "a sign of inflammation commonly obtained in the setting of possible joint infection." According to the Mayo Clinic,  "When your blood is placed in a tall, thin tube, red blood cells (erythrocytes) gradually settle to the bottom.  Inflammation

at 18, outside of the normal range of 3-9 mm/hr.  The percentage of granulocytes[3] were elevated at 95.1, outside of the normal range of 37-79% and his percentage of lymphocytes was 2.9, outside the normal range of 20.0-45.0%.  During the April 7th visit, Brandon also developed a rash, a new symptom not present on Thursday, April 5th.

Following McDonald's examination and review of the lab results, Dr. Sri Venkateswara Yedlapalli, an emergency room doctor on staff, conducted an examination.  His examination, however, is not documented in the record.  Dr. Yedlapalli ordered a CT scan, which was read by Dr. Jeffrey Zatorski, a radiologist off-site in Houston who was on call for CHC.  The clinical history provided to Dr. Zatorski indicated that Brandon had had pain for five days and was "unable to ambulate."  Dr. Zatorski looked at the CT scan and found that it showed fluid adjacent to the left greater trochanter[4] and may represent bursitis or a possible bursal tear.  He also recommended that an MRI be done.  McDonald contacted Dr. James Green, Sr., an orthopedist who was on call in Meridian, Mississippi. An appointment was scheduled for Brandon to see Dr. Green on Monday morning.

---

can cause the cells to clump together.  Because these clumps of cells are denser than individual cells, they settle to the bottom more quickly.  The sed rate test measures the distance red blood cells fall in a test tube in one hour.  The farther the red blood cells have descended, the greater the inflammatory response of your immune system."  *Sed rate (erythrocyte sedimentation rate)*, Mayo Found. for Med. Ed. and Research, http://www.mayoclinic.com/health/sed-rate/MY00343 (last visited Dec. 16, 2013).

[3] According to the National Institutes of Health, "Granulocytes are a type of white blood cell that is made of small granules, which contain proteins.  The types of these cells are neutrophils, eosinophils, and basophils.  Granulocytes help the body fight bacterial infections. The number of granulocytes in the body goes up when there is a serious infection.  People with lower numbers of granulocytes are more likely to get bad infections more often.  Granulocytes are counted as part of a white blood cell differential test."  *Granulocyte: MedlinePlus Medical Encyclopedia*, Nat'l Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/003440.htm (last visited Dec. 9, 2013).

[4] The trochanter is "[o]ne of the bony prominences developed from independent osseous centers near the proximal end of the femur."  *Stedman's Medical Dictionary* 2035 (28th ed.,

On April 7th, CHC diagnosed Brandon with "possible bursitis vs. possible bursa tear." He was given prescriptions for Benadryl, Tylenol and Lortab.  McDonald also prepared a referral to Dr. Green, and a packet with the materials from the clinic encounter.  At 5:45 p.m., Brandon was discharged in "stable condition" and sent home.

Brandon spent the remainder of Saturday evening in bed, unable to walk and with a developing rash.  The next morning, on April 8, 2007, at 5:52 a.m., Chickaway took Brandon to Neshoba County General Hospital.   By this time, Brandon was having trouble breathing and had severe pain in his left hip.   He was found, as the Government notes, to be "profoundly neutropenic[5] and in septic shock."[6]  He was given fluid and antibiotics.  At 6:56 a.m., Brandon was transferred via ambulance to the Pediatric Emergency Department at the University of Mississippi Medical Center ("UMC") in Jackson.   While in transit, the ambulance had to stop at Leake Memorial Hospital in Carthage at 7:50 a.m. for emergency stabilization.   Brandon was then intubated and airlifted to UMC at 8:58 a.m.   He arrived at UMC at 9:17 a.m. and was admitted to the emergency room.

At UMC, Brandon was diagnosed with septic hip.  Initially, his bacterial culture revealed broad-spectrum susceptible bacteria, meaning that it could be treated with a wide range of antibiotics.  By April 9, however, Brandon had developed acute respiratory distress syndrome.

_____

2006).

[5] Neutropenic describes a person who has "abnormally small numbers of neutrophils [white blood cells which fight infection] in the circulating blood."  *Stedman's Medical Dictionary* 1317 (28th ed. 2006).  *See also Merck Manual* 1322 (18th ed. 2006) ("Neutrophils constitute 40 to 70% of total [white blood cells]; they are a 1st line of defense against infection. . . . During acute inflammatory responses (eg, to infection), neutrophils . . . leave the circulation and enter tissues" to fight pathogens, which are disease-causing agents such as bacteria or viruses).

[6] *See* Defendant's Proposed Findings of Fact and Conclusions of Law, at 4.

-5-

Poor perfusion caused large areas of ischemia and deep tissue necrosis in all four of his extremities.  Essentially, Brandon's limbs lost blood flow and slowly turned black and blue as his condition worsened.  "Survival appeared unlikely from early on in the hospital course." UMC Expiration Summary, Ex. P-9, at 961.  Brandon remained in the pediatric intensive care unit for more than two months until June 12, 2007.  On that day, Brandon took his last breath. He died of multiple organ failure, sepsis syndrome and a staphylococcus aureus infection.

## II.  Procedural History

Plaintiff brings the current malpractice action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680.  At all times relevant to this lawsuit, the Choctaw Health Center was a tribally operated facility that is deemed to be part of the United States Department of Health and Human Services ("HHS") under Title I of the Indian Self-Determination Act.  25 U.S.C. § 450f(d).  Nurse McDonald, Dr. Yedlapalli and all other CHC personnel are deemed employees of the United States acting within the scope of their employment at the time of Brandon's treatment.  Plaintiff timely presented her individual and representative claims under the FTCA with the Department of Health and Human Services for incidents arising out of the medical treatment and health care that Brandon received.  After having exhausted her administrative remedies, she timely and properly filed suit in this court on February 11, 2011.[7]

---

[7] On December 19, 2008, the Department of Health and Human Services ("HHS") received Standard Form 95s, which constituted the presentation of Plaintiff's administrative claims, pursuant to 28 U.S.C. § 2675.  After waiting more than the required six months for a response to the claim, she filed suit in this court. *See id.* ("The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.")  On March 21, 2011, HHS notified Plaintiff of its denial of her claims.

### III.  Findings of Fact

Plaintiff's primary complaint is that the providers at Choctaw Health Center breached the standard of care by failing to properly or timely diagnose and treat Brandon's infection by providing him with antibiotics on April 7, 2007.  As to that claim, the Plaintiff has adequately proven, through expert testimony and the testimony of the CHC providers, that Brandon's lack of treatment was the proximate cause of his death.  All credible testimony indicates that, at the time that Brandon first presented to the CHC providers, that he exhibited sufficient symptoms that would have placed a reasonable medical provider on notice of the probability that he had a septic bacterial infection in his hip or upper leg that should have been ruled out.  Plaintiff has established that, had Brandon received a proper medical evaluation at CHC and been treated with antibiotics on April 7th, more likely than not, Brandon would have survived.

#### A.  Breach of the Duty of Care

There is no disagreement that CHC met the standard of care when Brandon presented to the clinic on April 5th.  The point of contention lies in the treatment that Brandon received when he presented for a second time on April 7th.  As discussed below, the Court finds that Plaintiff provided credible testimony and evidence that there was a breach of the standard of the care at each phase of Brandon's treatment on April 7th.  The Plaintiff's experts, Dr. Steven Shore and Dr. John Spangler, provided persuasive testimony that the medical standard of care in this case requires providers to consider all of the signs and symptoms, rule out the most life-threatening diagnosis first, administer antibiotics immediately and transfer the patient to a higher level of care.

1) Evaluating Brandon's Symptoms

When Brandon arrived at CHC on April 7th, CHC providers gathered Brandon's vital signs, performed physical examinations, and conducted laboratory tests. The Court will evaluate the treatment that Brandon received in the order in which it was delivered.

a) Vital Signs

When Brandon first arrived, CHC staff took his vital signs. Brandon's pulse was elevated to 150, where the normal range is 70-100. He suffered tachycardia, or a rapid and unusually fluctuating heartbeat; his pulse rates ranged from 133 beats per minute to 150 beats per minute. His blood pressure had fallen since his previous visit. His blood pressure was 97/57, a significant decrease relative to 135/68, his blood pressure during his visit two days before on April 5th. Brandon's pain level was 10 out of 10 – up from 3 out of 10 on April 5th. Dr. Shore and Dr. Spangler testified that an elevated pulse, tachycardia and decreased blood pressure are early signs of a septic hip. McDonald admitted that she noticed that Brandon had tachycardia, which she also acknowledged is a sign of a septic hip.

1. Drop in Blood Pressure

Dr. Shore also testified that the fact that Brandon returned to CHC with lower blood pressure but increased pain is also a red flag. According to Dr. Shore, the combination of low blood pressure and increased pain would lead him to wonder whether Brandon was septic. During sepsis, the blood pressure drops. The germs multiply in the bloodstream, causing the blood vessels to dilate. There is not enough blood or fluid to fill the vascular space. The heart rate increases to make up for the lack of blood volume, and the blood pressure drops because the vessels have dilated. The heart tries to make up for an even lower blood pressure by pumping more blood, to keep more blood circulating in the system. Yet this warning sign was missed

-8-

because CHC did not check Brandon's records from April 5th to compare the change.[8]

## 2. Lack of Fever

Along with these other metrics, CHC staff took Brandon's temperature.  It registered at 97.4 °F.  On April 5th, Brandon's temperature was 98.7 °F.  Thus, Brandon was within the normal temperature range of 98.6 °F and was afebrile, or without a fever.  The Defendant has relied heavily on the fact that Brandon did not have a fever when he presented to CHC as a defense to the Plaintiff's argument that the combination of all of Brandon's signs and symptoms on April 7th should have directed CHC providers to rule out septic hip before he was discharged.  During cross-examination of Dr. Spangler, the Defendant presented medical literature which describes four factors that a study has found to be predictive of septic arthritis, which is similar to septic hip, the bacterial infection with which Brandon was later diagnosed.  The study found that septic arthritis "includes": 1) fever of greater than 38.5 degrees Celsius, which Dr. Spangler testified was equivalent to about 101.3 degrees Fahrenheit, the week prior to presentation; 2) refusal to bear weight; 3) a sedimentation rate greater than forty; and 4) a white blood cell count above 12,000 or a C-reactive protein greater than two.  According to Dr. Spangler, these factors are commonly called the Kocher criteria.

The Plaintiff's experts provided the more persuasive testimony to guide the amount of

---

[8] Knowing what is in the records of a patient who, in this case presented at the same facility two days earlier, is important, as this Court explained in *Hardy*:  "Although medical providers use many tools to assess patients, they also review a patient's medical records/chart—not because they anticipate litigation, but because the records provide vital information which aids the providers in deciding a course of treatment."  *Hardy v. United States*, No. 3:09-CV-328, 2013 WL 1209647, at *3 (S.D. Miss. March 25, 2013).  *See also Miss. Baptist Health Sys., Inc. v. Kelly*, 88 So.3d 769, 776 (Miss. Ct. App. 2011) (adopting expert testimony that the proper standard of care when assessing a patient for a specific ailment includes "reviewing past records" and "reviewing pre-admission assessments").

weight that the Court should give to Brandon's lack of a fever on April 7th.  Dr. Spangler testified that he does not rely on the Kocher criteria because it was developed during the 1990s with a small population sample before the staph epidemic in the United States took off. Staphylococcus aureus, commonly known as "staph," is a bacteria that can cause infections; indeed, it can be fatal if it is not timely and properly treated.  Dr. Shore, an expert certified in pediatric infectious diseases, testified that the United States has been experiencing an epidemic of bacterial infections due to staph since 2000.  Previous strains of the bacteria used to remain in one part of the body.  Today, they have mutated and they are able to invade tissue and cause death.  As a result, the possibility of a staph infection in the bone or joint must be taken more seriously than in previous decades because staph now has the propensity to invade the bloodstream and cause death.

Dr. Spangler also testified that the standard of care required that a CHC provider should have asked Brandon or his family about whether he had had a history of fever or if he had had chills.   Even the Defendant's own criteria suggests that a provider should investigate the possibility that Brandon had a fever within the past seven days.  Brandon's medical records from April 7th indicate that he had been to CHC before on April 5th.  McDonald admitted that she knew that had been to the clinic on April 5th, but that she did not look at his medical chart from April 5th to compare any of the signs and symptoms that Brandon presented on April 7th to the ones that he had presented on April 5th.  Indeed, if Brandon's temperature had changed significantly from April 5th to April 7th, or Brandon had reported any recent history of fever on April 5th, she would not have known it at all because she chose not to review the medical records from his previous visit.  The April 7th records do not reflect any investigation into

Brandon's recent medical history to determine if he had had any symptoms related to a fever during the past week, and neither McDonald nor Yedlapalli testified to the contrary at trial.  At trial, McDonald did not provide a satisfactory reason for her decision not to pull Brandon's medical records to compare his signs and symptoms.  Obtaining Brandon's prior medical history, this Court finds, would have aided McDonald and the other providers in providing appropriate care to him.

Notes in the medical records entered by McDonald indicate that Brandon presented with fine tremors, or a slight shakiness in his body.  When she saw Brandon's fine tremors, she thought that he might be febrile or having chills, but she did not believe that it pointed to septic hip.  Dr. Shore testified that fine tremors indicate that the body is chilling, or cooling itself down.  When the body chills, it is attempting to make a fever.  The body attempts to make a fever with chills because raising the body temperature is one way to give the white blood cells an advantage, presumably in fighting an infection.

The Defendant's expert, Dr. Andrew Hannapel, testified to the contrary.  He contended that fine tremors do not necessarily indicate a septic hip, and that they can come simply from pain or chills.  He also stated that, in response to observing this behavior, McDonald checked his vital signs again to see if he had a fever.

The Court credits the testimony of Plaintiff's experts regarding the significance of fine tremors.  Even if fine tremors can come from other ailments, such as pain or chills, a medical provider must evaluate all signs and symptoms in relation to each other to properly diagnose a patient.  McDonald recognized that fine tremors could signify that Brandon was developing a fever, which is why she rechecked his temperature.  Dr. Shore indicates that fine tremors are part

of the process of the body cooling down to make a fever, particularly to support white blood cells as negative bacteria take over the body.  The other signs and symptoms that Brandon exhibited along with fine tremors or chills were sufficient to lead a reasonable provider to at least rule out septic hip or a bacterial infection, which is far more dangerous than bursitis, the single diagnosis made by the CHC.  Fine tremors also do not point mainly toward injury along with the other factors.  Thus, fine tremors do not support a diagnosis of an injury in conjunction with all of the other information which Brandon presented on April 7th.

As a counter to the Defendant's argument that Brandon's lack of a fever helped to justify CHC's failure to properly diagnose his ailment, the Plaintiff's expert explained that the fact that Brandon had taken Motrin could have masked Brandon's presentation of a fever.  At trial, however, Chickaway testified that Brandon had not been able to swallow the Motrin pills prescribed to him on April 5th and that she had given him Tylenol instead.  She also testified that, when she picked up Brandon from school on April 5th after he had reported that he was ill, she had given him some Tylenol in her truck.  It is unclear how much Tylenol she gave Brandon in her truck.  She testified that she also gave him one and a half teaspoons of Tylenol at home after he could not swallow the Motrin pills.  At trial, Dr. Spangler testified that this amount was half the normal dosage for a twelve year-old child of Brandon's size.  He explained, though, that this amount of Tylenol still could have masked the presentation of a fever.  Brandon was also given Tylenol when he presented at CHC on April 7th, which added to the amount that he received.  Furthermore, Brandon had also received Lortab on April 7th.  Dr. Shore testified that Lortab contains acetaminophen, the same chemical in Tylenol which contributes to masking a fever, and that it could have masked Brandon's fever as well.  Trial Transcript, Aug. 14, 2012, at

22:11-16.  The Defendant did not present sufficient evidence to indicate that the amount of these drugs that Brandon was given was not sufficient to suppress a fever that would have developed otherwise.

The Court finds that the amount of Tylenol that Brandon was given was likely a contributing factor to the fact that Brandon did not present a fever on April 7th.  Even despite Brandon's taking Tylenol, the Plaintiff's experts and the medical literature presented at trial have made it clear that the lack of a fever is insufficient to rule out septic hip.  As Dr. Shore testified, a patient does not need to have a fever to have an infection in the hip area.  Indeed, Brandon did not have a fever when he went into septic shock at Neshoba County General Hospital the next morning on April 8th.[9]  The Court credits Dr. Spangler's testimony and finds that all of the factors together, as will become clear below, still showed that Brandon had a septic hip and that CHC violated the standard of care in failing to rule it out.

b) Physical Examination

McDonald began her examination of Brandon that day at 1:40 p.m.  McDonald testified that, during her visit with Brandon, she was attempting to determine whether his pain was the result of an injury or a bacterial infection.  Both McDonald and Yedlapalli testified that Yedlapalli, the emergency room doctor on staff, also examined Brandon that afternoon.  There is, however, no documentation of his exam in the record.   Yedlapalli only signed the medical chart.  The Court finds that McDonald and Yedlapalli violated the standard of care by failing to follow

---

[9] An emergency room triage report indicates that Brandon's temperature was 97.6 ºF when it was measured shortly after he arrived at Neshoba County General Hospital.  As noted above, the fever could have been masked by the pain relievers that he had been taking before he arrived at the hospital.

necessary procedures in conducting a proper examination of Brandon on April 7th.

### 1. Gathering Patient History

According to McDonald, she physically examined Brandon twice on April 7th.  On her first visit to his treatment room, Brandon was lying on a stretcher on his back.  He was asleep with both hands folded and behind his head, and his legs were straight and crossed at the ankle. Both of his parents were in the room.  McDonald first introduced herself and gathered his patient history.  She testified that she typically asks questions in multiple ways to guide patients and families to explain how an injury has occurred.  She first gathered history from Brandon's father. Phillips told her that Brandon could not tolerate weight on his left hip.  She then recorded the medications that Brandon was taking; however, she did not write the last dose given of any of the medications because she did not complete that entry.

Brandon's medical records do not reflect that McDonald asked questions about "pertinent negatives," or information that would have distinguished Brandon's issue from an injury or a possible infection.   Dr. Shore testified that questions about the patient's medical history are very pertinent.  They constitute more than eighty percent of the process of making a diagnosis and should be documented.  He also testified that a provider should consider all signs and symptoms when trying to diagnose a disease.[10]  It would be important to determine if he had previously had an infection and if the infection could have spread from one spot to another.  Brandon, however, was never asked if he had recently had an infection or used antibiotics.

Yedlapalli testified that he examined Brandon after McDonald.  When asked about the

---

[10] Dr. Shore explained that a sign is a physical finding, while a symptom is a behavior or characteristic that the patient exhibits.  For example, in this case, a sign may be that a hip joint

fact that the chart does not reflect answers to negative questions about Brandon's patient history, he stated that CHC does not document negative patient history, or what patients have not done. Instead, they document "positive pertinent findings."  He suggested, "If you keep on documenting negative findings, there is no end to it."  In this case, questions such as whether Brandon had a history of fever, a history of infection, exposure to someone who was ill, or a history of taking antibiotics recently are all relevant to determining if Brandon's signs and symptoms were the result of an injury or an infection.  Based on the absence from the medical records of such documentation, it is reasonable to infer, and the Court does so, that Yedlapalli made no such inquiries.  On cross-examination, Yedlapalli acknowledged that having information documented in the records assists him and other providers in making their diagnoses. The Court finds that CHC violated the standard of care by failing to pursue the information necessary to make a proper diagnosis of Brandon's condition.

After speaking with Brandon's father, McDonald awakened Brandon, who had been asleep.  According to the medical records, Brandon "awakened with ease." At trial, McDonald testified that Brandon seemed very relaxed and did not appear ill or lethargic.  She also noted that he did not have a guarded position to show that he was trying to protect a certain part of his body, such as holding onto his hip area.  However, Dr. Shore, the Plaintiff's expert, testified that the fact that Brandon, a normally healthy twelve-year-old boy, was sleeping in the middle of the day while having a pain of 10 out of 10 should have indicated that he was lethargic.  He also testified that lethargy is a symptom of infection, but not bursitis, which was CHC's final diagnosis.  The Court credits his testimony and finds that Brandon showed signs of lethargy

---

doesn't move properly; a symptom would be the failure to walk or bear weight.

during the April 7th visit.

## 2. McDonald's Physical Examination

During McDonald's examination of Brandon, she asked him to show her where his pain was. According to the records, Brandon pointed to his left hip, at the "lateral/anterior hip/superior femur area." McDonald found that he was moderately tender when she applied pressure to the hip area with her fingertips. Then, she asked Brandon to move his hip joint. She recalled that, when she performs this exam on her patients, she usually has patients lie flat while she places her hand about twelve to fifteen inches above their foot. She asks patients to lift their foot to touch her hand to see if they can elevate the foot. She asks them to swing their foot out as far as they can and bring it all the way in, while keeping the knee straight, to assess the mobility of the joint. At trial, she testified that Brandon had a limited range of motion due to pain. Dr. Shore testified that this limited range of motion is a sign of infection in or around the hip.[11]

After this initial physical examination, McDonald ordered an X-ray to evaluate the joint distal to the hip and the femur bone. She also attempted to rule out the possibility of a dislocation or fracture. She testified that, in her review of the film, she did not find any abnormalities in the X-rays.[12]

---

[11] Yedlapalli testified that one of the reasons that he did not diagnose Brandon with septic hip was because he and McDonald were able to fully rotate Brandon's hip. He found that they were able to rotate Brandon's hip, but that tenderness was found in the greater trochanter, the area just below the hip. The Court finds that the limited range of motion that Brandon had in the hip area, tenderness in the hip area, and all of the other signs and symptoms identified indicated that the probability of a bacterial infection should have been ruled out. Indeed, the ability to rotate the hip does not rule out a bacterial infection.

[12] After McDonald's initial review, the X-rays were also evaluated by Dr. Christian, CHC's radiologist on staff. According to McDonald's testimony, Dr. Christian reviews the film on Sunday evenings, usually to read all of the X-ray films that have been obtained over the

After reviewing the X-ray, McDonald returned for a second, more detailed exam. She testified that she focused on examining Brandon's left hip and lower extremity. She performed a full range of motion exam. Dr. Shore testified that this exam typically includes four areas: internal and external rotation, abduction, and adduction of the joint.[13]  McDonald explained in great detail the standard way in which she performs hip examinations, which involves determining whether the patient can fully rotate the affected hip joint. She also compared patients' ability to move the unaffected joint and determine if the muscle strength is equal or consistent. She also performed a log roll. According to McDonald, a log roll is a procedure in which the provider places both hands on the patient's foot, supporting the foot at the heel and across the toes. The provider rotates the heel and the toes in opposite directions and to opposite extremes. Dr. Shore provided a similar explanation of log rolling in his testimony that corroborates McDonald's explanation. He testified that log rolling is a common examination of the hip. When a patient has an inflamed hip with fluid in it, he typically loses his ability to rotate the hip internally. While McDonald did not list all of the range of motion tests she performed on Brandon in the record, she found that Brandon could fully rotate his hip, but only when she manipulated or moved the joint. He could not move it on his own during the first examination.

### 3.  Diagnosing Rash

During McDonald's initial evaluation, Brandon developed an erythematous rash. McDonald's notes in the medical records state that Brandon had a "new (or now) developing

---

weekend. Dr. Christian observed what he suspected was "an avulsion of the ossification center of the lesser tuberosity," but found that the hip was "otherwise unremarkable." Ex. D-1, at 480.

[13] McDonald testified that her examination also involved extending Brandon's joint.

erythematous rash to arms."[14]  Dr. Shore testified that Brandon's sudden rash was a sign of septic hip.  In his expert report, he specifically states that the rash on Brandon's arms is "always suggestive of infection with organisms such as staph aureus or group A streptococci." According to Shore's testimony, it was the most important factor suggesting that Brandon had an infection rather than an injury because he was not taking any drugs likely to cause an allergic rash.  To the Defendant's credit, it has not argued that an injury alone could have produced the rash.  No evidence in this record would support such an argument.

McDonald testified that she observed that Brandon was scratching the rash, which indicated that it was itching.  She believed, however, that the rash was a sign of external contact to the skin to which the skin was reacting; it would not typically suggest an internal reaction because it involved one specific part of the body and it was itching.  She did not, however, attempt to gather any information from Brandon on whether he would have come into contact with anything in his external environment that would have caused a rash, like poison ivy.  In fact, CHC providers never diagnosed the cause of the rash.  Instead, McDonald gave him Benadryl, which treats allergic reactions and does not treat a bacterial infection.  Indeed, none of the medicine prescribed and given to Brandon that day could treat a bacterial infection; the testimony of the providers and the experts was unanimous on that point.  At trial, McDonald also agreed with the assessment that the rash was a sign of septic hip, although she believed that it

---

[14] The fact that McDonald described the rash specifically as an "erythematous" rash on Brandon's medical chart suggests that she knew that the rash was a sign of infection. "Erythematous" refers to erythema, which is a "[r]edness due to capillary dilation, usually signaling a pathologic condition (e.g., inflammation, infection)."  *Stedman's Medical Dictionary* 666 (28th ed. 2006).

was a rare sign.[15]  Yet, during the April 7th visit, the rash developed before her very eyes and she did not attempt to identify the cause of the rash or have any other medical provider diagnose it. The Court concurs with Dr. Shore's testimony that the rash would indicate that Brandon's illness was more likely an infection than the result of an injury.

After observing the rash, McDonald noted that Brandon presented fine tremors in his hands.  She interpreted them to be signs that he was developing a fever, which is proper according to Dr. Shore's testimony above.  She checked Brandon's temperature again and he was afebrile.  At that point, she asked Yedlapalli to come to the room and examine Brandon so that he could provide a second opinion.  She testified that she stepped out of the exam room and explained her findings to Yedlapalli in the hallway.  Then, they returned to the exam room and Yedlapalli performed his exam.

#### 4.  Yedlapalli's Physical Examination

McDonald testified that, during his exam, Yedlapalli listened to Brandon's heart, lungs, abdomen, palpated the abdomen, and examined Brandon's left hip and lower extremity.  He did not observe any abnormal findings.  He recommended that McDonald order a CT scan and more tests.

Yedlapalli's testimony, however, raises questions of credibility.  Yedlapalli admitted that he did not specifically recall even seeing Brandon.     His examination is undocumented in the record.  Dr. Shore testified and McDonald agreed that the medical standard of care requires that a

---

[15] The medical records also indicate that, immediately after Nurse McDonald noted the rash, she rechecked his temperature and blood pressure.  Experts have testified that a fever and fluctuating blood pressure are signs of a bacterial infection.  This recheck at that moment suggests that Nurse McDonald may have been checking to see if the rash was a sign of infection.

provider document physical exams.   But Yedlapalli explained that he did not document his examination of Brandon because he agreed with McDonald's findings.   Since she had conducted the original examination and he agreed with her findings, he simply signed the chart.   This reasoning, however, does not comport with the purpose of documenting physical exams.   One reason to document a physical examination is so that future providers may review the examination and use it as a guide for giving patients follow-up treatment.   *See* Furrow et al., *Health Law* 140 (1995) ("The record is a data base containing factual information about a patient's health status and recording medical opinions based on that information.   It is an essential part of a patient's continued treatment.") (citation omitted).   At the time when Yedlapalli testified, it had been more than five years since he had examined Brandon.   In the interim, he had seen thousands of patients.[16]   Understandably, he is not expected to recall every detail.   His written record would have better reflected exactly what was done, what questions were asked, and what information Yedlapalli received, relied upon or deemed important.   Because memories fade over time, medical records which are completed fully and accurately contain the most telling evidence.   *Hardy*, 2013 WL 1209647, at *3 (citing Furrow et al., *Health Law*, at 144).

From Yedlapalli's testimony, it is clear and the Court so finds that Yedlapalli did not ask

---

[16] Yedlapalli testified that he could not remember how many patients he had seen at CHC, but that in his current position, he sees about 15 patients a day in the clinic and between 20-25 patients if he works in the ER.   *See* Trial Transcript, Aug. 15, 2012, at 60:5-14.   If we assume that he only sees 15 patients a day (whether in the clinic or the ER) for only 40 weeks each year, he would have seen 1,800 patients in one year alone.   Based on his own testimony, he has certainly seen "thousands" of patients since he treated Brandon five years ago – perhaps 9,000 patients over five years with a similar number of encounters per year.

Brandon to walk.  The inability to walk, in fact, is a cardinal symptom of septic hip.  Nothing in the medical records suggests that Yedlapalli ruled out septic hip or that he conducted a differential diagnosis.  In short, the Court gives little weight to Yedlapalli's testimony because, even though he testified extensively about all that he did, which was worthy of documentation, he admitted that he had no specific recollection of seeing this patient.  His testimony regarding his examination also lacks credibility where it does not comport with corroborating evidence about the April 7th visit.

> c) Lab Work

During Brandon's lab work, McDonald requested an X-ray and a complete blood count.  Yedlapalli requested a CT scan.  The Court finds that CHC failed to meet the medical standard of care by failing to conduct tests that would rule out sepsis, the most life-threatening or dangerous cause of Brandon's symptoms, on their differential diagnosis.

CHC conducted a CT scan on Brandon per Yedlapalli's recommendation.  While they have the capability to conduct CT scans on site, CHC relies on a physician who reviews the scans remotely with a brief amount of clinical history.  The clinical history indicated that Brandon had an "injured left pelvis/hip" and was "unable to walk."  The results were that there was "fluid adjacent to the left greater trochanter, may represent bursitis or possible tear.  Recommend MRI.  No definite fracture."  McDonald observed that Brandon was very tender in that area and that it confirmed the area of the "possible injury."   Dr. Shore testified that this CT scan result, although brief, provided some indication that Brandon may have had an infection in his hip.  The result found that there was "fluid adjacent to the left greater trochanter."  Dr. Shore testified that fluid collection from an abscess indicates that the patient may have an infection and

that a provider must make a definitive diagnosis as to whether there is indeed an infection. McDonald testified that she noticed from the preliminary CT scan that Brandon had fluid around the hip area.  She recommended that the fluid be aspirated, or removed from his body, and checked; she scheduled a follow-up MRI with Dr. James Green, Sr., an orthopedist in Meridian, for the following Monday, on April 9th.  She did not, however, provide Brandon with any antibiotics or immediate treatment despite the life-threatening nature of his probable bacterial infection.

McDonald testified that she reviewed the CT scan with Yedlapalli and he recommended that she call Dr. Green.  After the call, she scheduled an appointment for Brandon to visit Dr. Green's office and receive an MRI on April 9th.  On cross-examination, McDonald admitted that she did not tell Dr. Green that Brandon had a probable bacterial infection and that he was unable to walk.  She testified that she told him the lab values, which to her "represented that he [had] a probable bacterial infection."  She also did not tell him that Brandon could not walk because she did not believe that he could not walk at that time.  The phone consultation lasted about five minutes.

The Court must reject the Defendant's contention that Dr. Green concurred with CHC's diagnosis that Brandon suffered from a bursal tear/bursitis as opposed to a bacterial infection. The Plaintiff's experts have testified with authority that the inability to walk in conjunction with the other symptoms that Brandon presented was a critical indicator that septic hip should be ruled out immediately.  McDonald's own belief that Brandon might have a bacterial infection based on the physical examination and lab work also could have affected Dr. Green's recommendation dramatically.   Dr. Green was not presented with the necessary relevant

-22-

information to make an informed diagnosis about Brandon's condition, or to recognize that his condition could not wait until Monday to be evaluated.

After the physical examinations, McDonald began to suspect that Brandon had a septic joint.  She testified that she prescribed Benadryl, Tylenol, and Lortab – none of which could treat an infection.  She also ordered lab tests for Brandon to be sure that he did not have a septic hip.  The lab tests included a complete blood count and a test of his sedimentation rate.  The complete blood count included a white blood count, which indicates the level of white blood cells in the body, red blood cells, hemaglobin, hematocrit, platelets, and other elements of the blood that are not directly related to infection.  All of these elements were within the normal range.  The elements related to infection, however, were outside of the normal range.  Brandon had markedly elevated granulocytes, which are the specific white blood cells that fight bacterial infections.  Brandon's overall white blood cell count was 6.1, within the normal range provided on the chart, which is 4.5-13.5.  By contrast, the percentage of granulocytes were elevated at 95.1, outside of the normal range of 37-79% and his percentage of lymphocytes was 2.9, outside the normal range of 20.0-45.0%.   In the additional lab test, Brandon's sedimentation rate was elevated at 18, outside of the normal range of 3-9 mm/hr.

2)  Differential Diagnosis

All of the experts, as well as McDonald, testified that health care providers have an obligation to rule out the most life-threatening or dangerous causes of symptoms on their differential diagnosis.   Armed with the information from Brandon's vital signs, physical examinations, X-ray, CT scan and lab work, CHC staff had a constellation of information that should have led a provider to rule out a bacterial infection before discharging Brandon on April

7, 2007.

The Defendant argues that CHC met the standard of care because they appropriately considered the possibility of septic hip and performed a number of different tests on Brandon to determine his ailment.  Despite the number of tests, all of the experts testified and McDonald agreed that none of them could conclusively rule out a septic hip.  First, neither X-rays nor CT scans can rule out a septic hip.  Dr. Robert Hardin, a radiologist in Jackson, Mississippi, who served as an expert for the Defendant, testified that an X-ray is an appropriate first step in evaluating or diagnosing a septic hip, but mainly to exclude other possibilities such as fractures. Dr. Shore testified that an X-ray can rule in a septic hip if certain signs are evident, but it is not a way to rule out a septic hip.  He testified to a study that showed that X-rays often do not detect the presence of a bacterial infection.  He also pointed out that one review found that fifty percent of septic hips showed normal radiographic findings and another study noted that older children were not likely to present radiographic signs in cases of septic arthritis.  Thus, if a provider observes widening between the joint, it is a useful finding, but not observing anything remarkable does not rule out a bacterial infection.  Both Dr. Shore and Dr. Hardin also testified that an X-ray does not allow a provider to see a septic hip in the early stages, as was the case with Brandon's bacterial infection.

According to Dr. Shore, a CT scan also cannot rule out a septic hip.  It could rule in a bacterial infection in the hip because it could detect an abscess, but a provider would have to study the image with contrast and CHC studied the image without contrast.  Dr. Hardin further testified that nothing in an X-ray or CT scan would rule out an infection; they can only rule *in* infections, but not rule them *out*.  He also indicated that the clinical presentation of a septic hip is

a "huge piece of the puzzle."  With only X-ray or CT scans and limited clinical background information, it would be very difficult for a radiologist to provide analysis that conclusively rules out a septic hip.  The Court credits Dr. Shore's testimony that neither an X-ray nor a CT scan can rule out a bacterial infection in the hip.

The lab work that CHC performed provided many indications that Brandon might have a bacterial infection and that it should be conclusively diagnosed and treated immediately.  Dr. Shore testified that the lack of elevation in the white blood cell count is the combination of a normal white blood cell count and a strong left shift.  A left shift occurs when the body is producing new white blood cells, particularly granulocytes.   Granulocytes, also called neutrophils, are the white blood cells that fight bacterial infections.  Normally, the body would make more white blood cells to fight off an infection and the count would be elevated.  But if the body is not making enough cells from the bone marrow, it means that the body is losing and the infection is winning.  A left shift is also more likely indicative of a bacterial infection, especially when the number of granulocytes totals above 95 percent.  In Brandon's case, they were 95.1 percent, more than double the normal range of 20.0-45.0 percent.  Younger cells are released from bone marrow in response to stress.  Mature neutrophils are released during a bacterial infection as part of the body's peripheral reserve.  The decrease in lymphocytes also indicated that Brandon had a bacterial infection and not a viral infection.  McDonald testified that, if there is a bacterial infection, there is an elevation in granulocytes and a decrease in lymphocytes; if there is a viral infection, the result is the opposite.  McDonald agreed that a left shift was indicative of a bacterial infection rather than a viral infection.  Dr. Shore explained and McDonald agreed that elevated granulocytes are specifically a sign of bacterial infection.

Brandon's sedimentation rate was 18, double the upper limit of normal.  Dr. Shore testified that that level of deviation from the normal limit meant that the SED rate was elevated, and that an elevated SED rate is more of a sign of bacterial infection than of a viral infection or an injury.  McDonald admitted that an elevated SED rate can be a sign of septic hip, though she also believed it that could represent "other issues" in the body.  In this case, she did not pursue finding the cause of the "mild elevation" or ruling out the most life-threatening cause.  Dr. Shore also testified that a normal SED rate cannot rule out a septic hip.  In many cases, depending on the timing of the test, a patient with septic hip can have a normal SED rate.  Brandon's symptoms, Shore testified, suggest that he was undergoing disseminated intravascular coagulation ("DIC").  In those cases, fibrinogen, a chemical made by the liver which causes the SED rate to increase, gets consumed by a long cigar-shaped molecule.  As a result, the SED rate, which may have been elevated two days before, was lower on April 7th.  The fact that it was elevated should have been a red flag, and Dr. Shore explained that it was probably not much higher because of the fact that Brandon was becoming septic.[17]  The Court finds that Brandon's increasing SED rate, at double the normal limit, should have led CHC to attempt to rule out a possible bacterial infection.

Given these warning signs from tests that ruled in the possibility of a bacterial infection, CHC did not conduct the tests necessary to rule out an infection.  According to expert testimony, septic hip could have been conclusively ruled out with: 1) a blood culture; 2) a throat culture; 3)

---

[17] When a patient is becoming septic,, a patient's platelet count decreases as blood coagulates.  On April 7th, Brandon's platelet count was 11.9, at the lower end of the normal range of 11.0-16.0.  On April 8th, Brandon's platelet count was down to 8.5, proving that he had DIC. The readings on April 8, although certainly not available to the providers when Brandon

-26-

C-reactive protein test; 4) an MRI; or 5) an aspiration of the hip, in which fluid is removed from the joint area and testified for bacteria.  Dr. Hannapel, the Defendant's expert, testified that a blood culture and an aspiration of the hip are the "gold standard" in determining if a patient has a septic hip.  But CHC did not ensure that Brandon received "gold standard" care, or any of these tests.  By not giving any of these tests, it is obvious to the Court that CHC was not attempting to provide a "gold standard" level of care (which the law does not require), but it did not even provide a "copper" or a reasonable standard of care.  The CHC staff could have performed a blood culture, a throat culture, or C-reactive protein test on site to determine if he had an infection – but they did not.[18]  CHC could have immediately referred him to another facility capable of conducting an aspiration of the hip – but they did not.  While CHC referred Brandon to see Dr. Green, an orthopedist, for an MRI, the referral was for Monday morning, nearly two days later after the weekend, when it was too late.

Indeed, McDonald testified that she knew that Brandon had a "probable bacterial infection" on April 7th.  She stated that, despite this belief, she did not give him antibiotics because she did not know what infection she was treating.  Yet McDonald made no effort to rule out whether the infection that she must treat came from the only reported source of Brandon's

---

was being treated, suggest that Brandon was in fact on the path to septic shock.

[18]  At trial, Dr. Yedlapalli testified that he recalled that Brandon received a C-reactive protein (CRP) test.  He stated that he recalled having seen it in Brandon's medical records.  The CRP test results are listed nowhere in Brandon's medical records.  Dr. Hannapel, the Defendant's expert, testified that he did not see these results in Brandon's records.  None of the other experts who reviewed Brandon's records testified that they saw these results.  Brandon is one child out of thousands of patients that he has seen in the last five years.  As Plaintiff's counsel did well to point out, it is quite possible that Yedlapalli is mistaken.  Without documented evidence of CRP test results, the Court does not credit this testimony and cannot incorporate these alleged results into its analysis.

pain: his hip.  The Defendant has argued that it would have been a breach of the standard of care for McDonald to have prescribed antibiotics "blindly" without a "real diagnosis" of septic hip or "any clinical indication" for giving antibiotics.  The Court finds that Brandon's vital signs, physical examination and lab work all provided clinical indications that Brandon had a probable bacterial infection.  McDonald had the means available on site to perform lab tests that could have ruled out septic hip, including a blood culture; a throat culture; or a C-reactive protein test. Dr. Shore testified that results typically take 16-22 hours to return if a blood culture is taken at a hospital.[19]  Nonetheless, the Court concurs with the testimony of Drs. Shore and Spangler that a provider should not wait to give a patient antibiotics while she waits for the results of the lab work because the patient could die or be permanently damaged.  At trial, Yedlapalli insisted that there was no indication to collect a blood culture.  The Court finds that this testimony lacks credibility given the signs and symptoms that Brandon presented on April 7th.  Proper diagnosis required that CHC collect a blood culture or perform another procedure that would conclusively rule out a septic hip.

Dr. Spangler testified that Brandon's infection was susceptible to a wide range of readily available antibiotics.  The Court concurs with Dr. Spangler's testimony and further notes that no evidence was presented at trial that would indicate that treating Brandon with a broad spectrum antibiotic would have had any harmful effect on him.  While the Defendant has suggested that there was a risk of overprescribing antibiotics, the Court finds that it violates the standard of care for a provider to determine that Brandon likely had a bacterial infection of the joint, but fail to

---

[19] There was no testimony presented a trial to suggest that a throat culture or a C-reactive protein test could not deliver results for whether a patient had a bacterial infection within a

provide any kind of antibiotics where they were available because of a generalized public health concern unrelated to the child's ailment.  The Court credits the testimony of Dr. Shore and Dr. Spangler that Brandon would have survived had he received immediate antibiotic treatment at CHC and been transferred to a facility that could provide definitive evaluation and treatment. Instead, Brandon was sent home with Benadryl, Tylenol and Lortab.  McDonald admitted at trial that none of these drugs treat or cure a bacterial infection.

The parties agree that one of the most important warning signs related to septic hip was the ability to bear weight or to walk.  In this case, the parties disagree about whether it was evident that Brandon could not walk on April 7th.  McDonald claims that she did not know Brandon could not walk because the triage nurse had marked that Brandon arrived "ambulatory" on his records.  She also testified that she performed the log roll test on Brandon and was able to fully rotate his hip.  Thus, she did not suspect that he could not walk.  The Court, however, finds by a preponderance of the evidence that Brandon could not walk on Saturday, April 7th.

McDonald testified that Brandon's father told her that no weight could be tolerated on Brandon's left hip.  The preliminary radiology report that McDonald requested and claims to have seen states that Brandon was "unable to ambulate."[20]  McDonald testified that she did not know the means of transport between Brandon's exam room to CHC's radiology department. The Defendant did not provide any testimony about whether Brandon walked to the radiology department to have his X-ray done or was transported another way. There are also conflicting accounts of how Brandon left the facility on April 7th.  The discharge summary in the records

shorter time period.
[20] Nurse McDonald clarified that "ambulate" means the same as walk, so anyone noting

-29-

states that Brandon exited by wheelchair.  Brandon's mother, however, testified that Brandon had to be carried out of the hospital.  Yedlapalli testified that Brandon would have exited CHC in a wheelchair because he had been given drugs that can cause patients to become unsteady.  CHC typically has patients who have received sedative-like drugs leave in a wheelchair to reduce the risk that they will fall and become injured.  Despite this disagreement, however, none of the parties testify that Brandon walked out of CHC on April 7th.

To be sure, McDonald physically examined Brandon twice and she and Yedlapalli have testified that Yedlapalli examined Brandon as well.  Despite their multiple exams, however, they never performed the crucial test: asking Brandon to walk.  Both McDonald and Yedlapalli admitted that they did not ask Brandon whether he could walk and they did not attempt to observe Brandon walk.[21]  McDonald also knew at the very least that Brandon could not tolerate weight on his left hip.  Drs. Shore, Spangler and Hannapel all testified that asking a child to walk is a critical part of any examination for hip pain.  Dr. Shore testified that even the way in which a child walks during the exam can aid a provider in making a diagnosis.

In addition, Brandon's weight was not obtained.  This point is important because it further indicates Brandon's inability to walk when he arrived at CHC.   Medical records from

---

that Brandon was "unable to ambulate" meant that Brandon could not walk.

[21] McDonald testified that she documented her second examination in which she states that Brandon was able to fully rotate his hip in the top half of the encounter form, which is the key medical record from the April 7th visit. Ex. P-1, at 89.  On this form, she indicated that she performed an "inspection" and checked "palpitation," "range of motion," "stability," and "strength." This form also includes a space where a provider can mark whether they observed a patient's "gait," or ability to walk.  That space on Brandon's record was the only space that was not checked, despite the fact that every other aspect of the muscular/skeletal system listed for evaluation ("digits, nails," "joints, bones," and "muscles") was checked.  This information corroborates McDonald's testimony at trial.

April 7th indicate that taking his weight was "deferred."  By contrast, CHC staff did take Brandon's weight during the April 5th visit, when there is no evidence that he was unable to walk.  The fact that the record says that taking his weight was "deferred" suggests that it was put off, not that the staff forgot about it or failed to consider it.[22]   No one from CHC provided an explanation of why the taking of Brandon's weight was deferred, and indeed never taken.  Counsel for the Plaintiff argued persuasively that it was deferred because McDonald saw that he could not bear weight on his left hip.  The Court agrees.

It stands to reason that Brandon's weight was not taken because he could not properly stand on a scale and he could not walk because he could not bear the weight of standing.  It is also clear that the triage nurse who took his vital signs "deferred" taking his weight because it was evident that he could not stand on his own.

The inability to bear weight on the hip is a sign of septic hip that is not to be missed.  Dr. Shore testified that it is "a sign of serious pathology until proven otherwise and children who are unable to bear weight should not be sent home until a diagnosis is made and therapy is instituted. . . . Septic bacterial arthritis is a diagnosis not to be missed in a child with hip pain where it is a potential diagnosis."  Dr. Spangler testified compellingly that a child that cannot bear weight on a leg should be presumed to have a septic joint until proven otherwise.  Dr. Spangler, a practicing physician and a medical school professor at Wake Forest University, stressed the importance of this specific sign: "[T]hat is just such a huge flashing . . . bright strobe light in your eyes [that]

---

[22] In fact, according to *Black's Law Dictionary*, defer means "to postpone; to delay," as in "to defer taxes to another year."  *Black's Law Dictionary* 486 (9th ed. 2009).  Or, more aptly in this case, to "defer" taking Brandon's weight until he could walk, because he could not walk when he arrived at the emergency room.

this child cannot bear weight.  This is abnormal and that is such a strong abnormality that if my medical student worked up a patient and didn't pay [attention] to that, I would give them an F." While CHC may have provided competent medical treatment to many other patients over the years, the CHC staff that directly treated Brandon do not get a passing grade on this assignment.

On April 7th, Brandon was diagnosed with bursitis or a possible bursa tear.   Yedlapalli testified that CHC arrived at this diagnosis because of the following reasons: 1) Brandon did not present with a fever and had no history of fever, which pointed toward injury and away from infection; 2) he had a normal white blood cell count, which points toward injury; 3) he had a SED rate mildly elevated at 18, where 40 is the "benchmark" for the hip when checking for septic hip; and 4) the doctor analyzing CT scans indicated that Brandon may have bursitis or a bursal tear.

Dr. Shore testified that this is a very unlikely diagnosis for a child.  A bursal tear or bursa inflammation, known as bursitis, is usually reported in older individuals and rarely with children. In his more than thirty years of practice as a pediatrician, he explained that he had never seen a child with a deep abrasion on the knee, for example, have bursitis.  Bursitis is also typically the result of direct trauma; the kind of trauma that also produces a left shift is almost always severe, such as a car accident or another harsh, blunt force.  In Brandon's case, a fall during a game also has no comparison to a car accident, the kind of direct trauma that generally precedes bursitis. Even assuming by way of argument that it could be described as trauma, the Court finds that the medical history does not support a diagnosis of bursitis or a bursa tear given both trauma and the left shift, along with all of Brandon's other symptoms.

Based on the evidence, the diagnosis did not comport with Brandon's symptoms.

-32-

Plaintiff's experts provided a compelling list, which encompassed nearly all of Brandon's symptoms, that are all signs only of infection and not bursitis: 1) lethargy; 2) the change in Brandon's blood pressure from April 5th to April 7th; 3) worsening pain from April 5th to April 7th; 4) the rash; 5) fine tremors/chills; 6) elevated granulocytes; 7) elevated SED rate; 8) the left shift in Brandon's complete blood count; 8) the fact that he could not tolerate weight on his hip[23]; and 9) his inability to walk.  The only signs or symptoms that are associated with both bursitis and a bacterial infection of the hip are: 1) pain; 2) joint tenderness; and 3) tachycardia. The Court concurs with Dr. Shore's testimony that Brandon did not exhibit any symptoms that only appear in bursitis, but do not appear in a bacterial infection.

The Government argues that Brandon's presented an atypical case of septic hip and that CHC followed the standard of care in attempting to diagnose and treat Brandon.  The testimony at trial makes it clear that Brandon presented ample signs and symptoms that he had a probable bacterial infection, and McDonald testified that she had concluded as much.  Furthermore, Dr. Spangler testified that, despite the differences in the lab results in Brandon's case as opposed to those in a typical case of septic hip, it was "statistically astronomically unlikely" that a child who had an elevated SED rate, a left shift, chills and an inability to walk would not have a septic hip. The Court concurs with his testimony and finds that CHC developed a differential diagnosis of a bacterial infection, but that it failed to consider all signs and symptoms in making its final diagnosis.  It also failed to conclusively rule out its differential diagnosis, and to timely and properly treat Brandon's symptoms.

---

[23] The Court concurs with Dr. Shore's testimony that, even in the medical literature on adults, the inability to bear weight is not a part of bursitis.

In short, the CHC failed to conduct the most necessary tests to rule out septic hip.  They also failed to properly evaluate the information that was already available.  The Court was persuaded more by the testimony in the field of general pediatrics and pediatric infectious diseases presented by the Plaintiff's experts, and, therefore, their testimony will be taken as evidence of the unfortunate scientific realities involving bacterial infections of the joints in children.  Under their tutelage, it is apparent that Brandon presented the symptoms necessary for a medical provider to rule out whether he had a bacterial infection and to provide him with antibiotics on April 7th and to transfer him to a facility that could provide more targeted care. The Court finds that the evidence decidedly indicates that Choctaw Health Center providers did not pay attention to (or overlooked) all of Brandon's symptoms.  By not looking at the whole clinical picture, they failed to follow the medical standard of care and missed the opportunity to save Brandon's life.

### B. Causation

The Court finds that all the evidence at trial conclusively establishes causation.  More likely than not, on April 7, 2007, had Choctaw Health Center identified Brandon's infection, treated it with antibiotics, and transferred him to an appropriate medical facility – as it was required to do under the standard of care – Brandon Phillips would have survived.  CHC's failures proximately caused Brandon's death.  As Dr. Spangler and Dr. Shore testified, broad-spectrum antibiotics would have saved Brandon's life on April 7, 2007.  Dr. Hannapel, testified that, more likely than not, on April 7th, if CHC had given Brandon antibiotics, IV fluids, and intensive care, Brandon would have survived.  By the time Brandon presented at Neshoba County General Hospital on April 8, 2007, it was too late for antibiotics to save Brandon.

Therefore, the Court finds by a preponderance of the evidence that the Plaintiff has met her burden on the element of causation.

    *C. Damages*

        1) Actual Economic Damages

    Under Mississippi law, the Court may award "verifiable pecuniary damages arising from medical expenses and medical care, rehabilitation services, custodial care, disabilities, loss of earnings and earning capacity, loss of income, burial costs, loss of use of property," among other incidents, costs and losses.  Miss. Code Ann. § 11-1-60(1)(b).  The Plaintiff presented evidence of the reasonable and necessary cost of two months of hospitalization and treatment that Brandon Phillips underwent because of CHC's failure to meet the standard of care.  Brandon Phillips was in the intensive care unit at University of Mississippi Medical Center in Jackson for nearly two months before his death.  Brandon was in great pain, could barely talk (and was often completely unable to talk), and required round-the-clock care.  The Court finds that this care and treatment was necessarily and proximately related to the Defendant's negligence.  The Court awards the Plaintiff the reasonable and necessary cost of this treatment of $894,493.03, as reflected in the medical bills.  *See Walmart Stores, Inc. v. Frierson*, 818 So.2d 1135, 1139-40 (Miss. 2002) (affirming the award of the full amount of medical bills under Mississippi law and the collateral source rule); Order Granting Motion in Limine, *Chickaway v. United States*, No. 4:11-CV-22 (S.D. Miss. Aug. 7, 2012), ECF No. 96, 2012 WL 3236518, (granting motion to exclude evidence regarding Medicaid payments).   The parties stipulated that the present value of Brandon Phillips's loss of earning capacity should be between the Mississippi Median Wage of $406,688 and the U.S. Median Wage of $505,918.00.  Ex. P-26.  "[T]here is a rebuttable

presumption that [a] deceased child's income would have been equivalent of the national average as set forth by the United States Department of Labor." *Greyhound Lines, Inc. v. Sutton*, 765 So.2d 1269, 1277 (Miss. 2000). *See also Clemons v. United States*, No. 4:10-CV-209, 2012 WL 5364737, at *8 (S.D. Miss. Oct. 30, 2012). Brandon Phillips's academic records show that he received grades that were categorized as "proficient" to "advanced" (the highest level of distinction possible) on standardized testing. He met or exceeded all benchmarks and excelled, particularly in mathematics. Accordingly, the Court awards Plaintiff $505,918.00 for Brandon Phillips's loss of earning capacity based on the U.S. median wage.

The Plaintiff also presented evidence of funeral bills in the amount of $3,550.00. Therefore, the Court awards the total reasonable and necessary funeral costs of $3,550.00, as reflected in the funeral bills.

### 2) Non-Economic Damages

Under Mississippi law, the Court may award noneconomic damages for "nonpecuniary damages arising from death, pain, suffering, inconvenience, mental anguish, worry, emotional distress, loss of society and companionship, loss of consortium, bystander injury, physical impairment, disfigurement, injury to reputation, humiliation, embarrassment, loss of the enjoyment of life, hedonic damages, other nonpecuniary damages, and any other theory of damages such as fear of loss, illness or injury." Miss. Code Ann. § 11-1-60(1)(a). Mississippi law allows the trier of fact to determine non-economic damages, and then requires the judge to cap those damages at $500,000. *Id.* §§ 11-1-60(2)(a) & (2)(c).

In this case, Brandon Phillips began suffering unnecessarily as early as April 7 and continued for two months while he was in intensive care. According to the expiration summary

prepared by UMC, "Survival appeared unlikely from early on in the hospital course" and his "[p]rognosis remained poor throughout."   He underwent multiple tests, treatments and procedures as the doctors attempted to save his life.  His family had to watch as many of his organs failed, one after the other.  Poor perfusion caused large areas of deep tissue necrosis in Brandon's arms and legs.   As Brandon's limbs died, his arms and legs turned black.  Amputations of Brandon's arms and legs were considered during the hospital course.  However, the risk of death with the procedure was felt to be too high.  In the last phase of Brandon's life, his critical course began to deteriorate.  On June 12, 2007, the hospital regrettably informed Brandon's parents that his heart would likely stop beating that day.  Brandon's mother requested to hold him.  She was able to do so in his bed for a short period of time.  His family was able to say goodbye.  Then, Brandon died with his parents by his side.

Brandon was born at the University of Mississippi Medical Center in 1995; his life came full circle when he died at that same hospital twelve years later in 2007.  As Plaintiff's counsel compellingly articulated at trial, "We have a name for a person who loses his or her spouse: a widow or a widower.  We call a child who loses his or her parent an orphan.  But there is no word in the English language for a parent that loses a child because it is unnatural and not supposed to happen.  In this case, it was tragically preventable."  There may be no word for it, but there is no doubt in this Court's view that Brandon's parents and his siblings have suffered a life-altering event, the devastation of which is infinite.  The heartache which has been inflicted upon them will never leave. Chickaway and her son, Brandon, shared the same birthday.  Chickaway's birthday will be forever scarred by the memory of the loss of her child, perhaps the most cherished of birthday gifts, with every passing year.

This Court finds that the non-economic harm suffered by Brandon Phillips, Wendy Chickaway, individually, and on behalf of all wrongful death beneficiaries of Brandon Phillips far exceeds the $500,000 cap. This case presents a deeply sad and painful story—a story made sadder and more painful by the laws of the state of the Mississippi. Plaintiff's ultimate recovery is substantially below the actual damage that the Plaintiff and the wrongful death beneficiaries have suffered. Brandon's life has concluded. At twelve years old, he missed the opportunity to experience the joys and heartaches, triumphs and failures that he, his parents and his sibling expected to share. From nagging and tattling on a sibling to being nagged and tattled on—those days have ended for Brandon. From being embarrassed by receiving a loving hug from his parents to looking forward to giving a warm embrace to those same parents—those days have ended for Brandon. From being dismissive of the notion that he might one day want to attend a prom, date and spend his time with someone special to anticipating those very days—those days have been taken away from Brandon. No more basketball for Brandon whether in PE or in his father's backyard. No days left to play Angry Birds, video games, read a book, solve math problems or to anticipate the next creation that causes children and adults to say, "When that comes out, I am going to buy it!"

As this Court lamented in *Clemon*s, "All grief is not equal. All pain cannot be reduced to a one-size-fits-all sum. . . . In Mississippi, though, one's suffering at the hands of a health care provider is worth no more than half a million dollars, no matter how egregious, and no matter if your suffering leads to your death. . . ." 2013 WL 3943494, at *14. *See also* Sherwin B. Nuland, *How We Die: Reflections on Life's Final Chapter* 3 (1994) ("Every life is different from any that has gone before it, and so is every death. The uniqueness of each of us extends even to the way

we die. . . . Every one of death's diverse appearances is as distinctive as that singular face we each show the world during the days of life.").

Brandon should not have been required to exit life's stage so early.  His last act was full of pain – the unimaginable pain that he endured; the never-ending pain that those who love him had to suffer while he made that painful transition; and the pain that they continue to endure.  It did not have to happen.  The place that Brandon held in the lives of his family members and all those who knew and loved him remains empty, and the laws of Mississippi make that place even emptier.

However, the Court will award non-economic damages at the cap of $500,000, the full amount deemed appropriate by the Mississippi Legislature and the amount that the Plaintiff requests.  Ex, P-30

Because the Defendant is an agent of the federal government, Plaintiff is not entitled to an award of punitive damages against the Defendant.  28 U.S.C. § 2674.  Any conclusion of law that may be deemed a finding of fact is so deemed.

## IV.  Conclusions of Law

This Court has jurisdiction of the parties and subject matter in this cause to hear and determine liability and damages arising out of the injuries sustained by Brandon Phillips, Wendy Chickaway, and all estate beneficiaries of Brandon Phillips, proximately caused by the negligent health care provided at Choctaw Health Center on April 7, 2007, pursuant to 28 U.S.C. §§ 1346(b), 2401, and 2671-2680.

Under the Federal Tort Claims Act, liability for medical malpractice is controlled by state law, the law of Mississippi in this case.  *See Hollis v. United States*, 323 F.3d 330, 334 (5th Cir.

-39-

2003).  Under Mississippi law, a plaintiff in a medical malpractice case must prove "that (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury, and; (4) the plaintiff was injured as a result."  *McDonald v. Mem'l Hosp. at Gulfport*, 8 So.3d 175, 180 (Miss. 2009).   Medical doctors are expected to have "medical knowledge commonly possessed or reasonably available to minimally competent physicians in the same specialty or general field of practice throughout the United States."  *Boyd v. Lynch*, 493 So.2d 1316, 1318 (Miss. 1986).  In a medical malpractice action, the plaintiff has to supply evidence that proper treatment would have provided the patient with greater than fifty percent chance of a substantially better result than he in fact obtained.  *Harris v. Shields*, 568 So.2d 269, 274 (Miss. 1990).  In other words, adequate proof of proximate cause requires evidence that in the absence of the alleged malpractice, a significantly better result was probable or more likely than not.  *Id.*

The injuries and damages sustained by Brandon Phillips, Wendy Chickaway, individually, and all wrongful death beneficiaries of Brandon Phillips were proximately caused by the negligent and wrongful acts or omissions of employees of the United States of America acting within the scope of their employment, under the Federal Tort Claims Act, and under circumstances where the United States of America, if a private person, would be liable to the Plaintiff in accordance with the negligence and tort law of the state of Mississippi, the substantive law applicable in this case.

Defendant United States of America is legally liable for Plaintiff's injuries and damages by reason of the negligent medical care provided by Choctaw Health Center.  Judgment is hereby

entered against the United States of America in favor of the Plaintiff in the amount of $1,903,961.  Title 28 U.S.C. § 2678 limits Plaintiff's attorney fees to 25% of the judgment and the Court approves attorneys' fees payable by Plaintiff to Archuleta, Alsaffar, & Higginbotham in the amount of 25% of the total judgment, including interest.

Plaintiffs should recover their costs of court from Defendant.

Under the FTCA, this Court does not award any pre-judgment interest.  *See* 28 U.S.C. § 2674.  However, post-judgment interest shall be awarded pursuant to 28 U.S.C. § 1961, subject to the limitations of 31 U.S.C. § 1304(b) and shall not accrue until such time as the judgment is filed with the appropriate agency.  *See Dickerson v. United States*, 280 F.3d 470, 478-79 (5th Cir. 2002).  *See also* Final Judgment, *Clemons v. United States*, No. 4:10-CV-209 (S.D. Miss. June 13, 2013), ECF No. 77; *Vanhoy v. United States*, No. 03-1090, 2006 WL 3093646, at *9 (E.D. La. Oct. 30, 2006); *Brook v. United States*, No. 08-60314, 2009 WL 1298303, at *4 (S.D. Fla. May 8, 2009).

The Court has considered all of the parties' arguments and those not addressed would not have changed the outcome.  Any finding of fact that may also be deemed a conclusion of law is so deemed.  A final judgment in accordance with this decision will be entered.

Signed this the 20th day of December, 2013.

SO ORDERED this the 20th day of December, 2013.

s/ Carlton W. Reeves_____
UNITED STATES DISTRICT JUDGE